**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lewis J. SMITH, Defendant–Appellant.**

**No. 94–4031.**

United States Court of Appeals,
Sixth Circuit.

Argued May 16, 1995.

Decided Jan. 25, 1996.

---

Michael J. Burns, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Columbus, OH, for U.S.

Keith E. Golden (argued and briefed), Golden & Meizlish, Columbus, OH, for Lewis J. Smith.

Before: JONES and RYAN, Circuit Judges; MATIA, District Judge.*

RYAN, J., delivered the opinion of the court, in which MATIA, D.J., joined. JONES, J. (pp. 1418–23), delivered a separate opinion concurring in the result.

RYAN, Circuit Judge.

The defendant, Lewis Smith, appeals his conviction and sentence entered after a bench trial for unlawful possession of more than five grams of cocaine base in violation of 21 U.S.C. § 844. We are asked to determine: (1) whether the district court erred in denying his motion to suppress evidence, and (2) whether the 100:1 sentencing ratio for cocaine powder and cocaine base in U.S.S.G. § 2D1.1 is unconstitutional. We conclude that the defendant's arguments are meritless

---

* The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation.

and therefore affirm the judgment of the district court.

## I.

On December 6, 1993, police officers David Barnes and Scott White were on routine patrol near a high school in Martins Ferry, Ohio, when they observed Smith seated in a vehicle parked on the side of the road. While passing the vehicle, Officer Barnes observed Smith slumped down in the driver's seat drinking a can of beer. The officers drove around the block in order to approach the vehicle from behind. When they returned to the place where the car had been parked, it was gone. After a brief search of the area, the officers spotted and stopped the vehicle. Officer Barnes exited his patrol car and approached Smith who had exited his vehicle. Officer Barnes asked Smith for his driver's license and Smith responded that he did not have it with him. When Officer Barnes asked Smith for his name and social security number, Smith allegedly turned and attempted to flee. Officer Barnes stopped Smith after Smith had taken only a few steps.

Before placing Smith under arrest, Officer Barnes looked into Smith's car and saw an open beer can sitting on the floor of the driver's side, marijuana scattered throughout the car, and additional unopened containers. Officer Barnes arrested Smith for possessing an open beer can in a motor vehicle, and for consumption of alcohol in a motor vehicle. At the police station, a search of Smith revealed a black film container containing over five grams of cocaine and $138.

Before trial, Smith moved to suppress the cocaine seized from his person at the police station and a loaded 9 mm Beretta pistol seized from the automobile pursuant to a warrant. The district court conducted a hearing and denied both motions. After a bench trial, Smith was convicted of possession of cocaine under 18 U.S.C. § 844 and of possession of a firearm during a drug trafficking offense under 18 U.S.C. § 924(c), which count was later vacated. On September 23, 1994, Smith was sentenced on the drug possession offense to 60 months impris-

onment to be followed by a three-year period of supervised release.

## II.

Smith argues that the district court erred in refusing to grant his motion to suppress the cocaine seized incident to his arrest. Smith maintains that he was stopped for a completed misdemeanor which is an improper basis for an investigatory stop.

When reviewing the denial of a motion to suppress evidence, the appellate court must consider the evidence in the light most favorable to the government. *United States v. Williams*, 962 F.2d 1218, 1221 (6th Cir.), *cert. denied*, 506 U.S. 892, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992). This court applies the clearly erroneous standard to findings of fact when reviewing the ruling of a district court on a motion to suppress but reviews conclusions of law *de novo*. *Id.*

A police officer is permitted to make an arrest without a warrant for a misdemeanor committed in his presence. *United States v. Watson*, 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976). However, this requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not mandated by the Fourth Amendment; it is merely a rule of the common law. *Welsh v. Wisconsin*, 466 U.S. 740, 756, 104 S.Ct. 2091, 2101, 80 L.Ed.2d 732 (1984) (White, J., dissenting); *Devine v. Pickering*, Nos. 91–5950/5961, 1992 WL 70188 at * 4 n. 2, 1992 U.S.App. LEXIS 7160 at *7 n. 2 (6th Cir. April 8, 1992) (unpublished disposition). The State of Ohio also generally requires that a misdemeanor be committed in the officer's presence for the officer to make a warrantless arrest for a misdemeanor offense. *State v. Henderson*, 51 Ohio St.3d 54, 554 N.E.2d 104, 106 (1990).

The defendant's argument that the officers could not stop him because a misdemeanor had been completed is meritless. The misdemeanor offenses of possessing an open container of an alcoholic beverage in a motor vehicle and consumption of alcohol in a motor vehicle were committed in the officers' presence. As the officers passed Smith's vehicle, they witnessed him slumped down in

his seat drinking from a can. The officers left only momentarily in order to effectuate a proper stop of the defendant since they had already passed Smith's vehicle and could no longer pull in behind it. The misdemeanor presence rule was not intended to apply to a case such as this where, due to the good fortune of the defendant, he was able to conclude his offenses and elude the police. Thus, the district court properly denied the motion to suppress.

## III.

Smith also challenges the constitutionality of the 100:1 ratio for crack cocaine and powder cocaine in section 2D1.1 of the Sentencing Guidelines. The defendant urges this court to reverse the law of this circuit and follow a recent decision by the United States District Court for the Northern District of Georgia, *United States v. Davis,* 864 F.Supp. 1303 (N.D.Ga.1994), which held that crack cocaine enhancements are unconstitutionally vague. The defendant urges this court to do so in light of new scientific evidence which suggests that there is no meaningful distinction between crack cocaine and powder cocaine.

■■■ The defendant therefore raises a constitutional challenge to his sentence, over which, as a question of law, this court exercises *de novo* review. *United States v. Knipp,* 963 F.2d 839, 843 (6th Cir.1992).

Section 841 contains the same ratio as that contained in section 2D1.1 of the Sentencing Guidelines. 21 U.S.C. § 841. This circuit has heard and rejected vagueness challenges to the 100:1 ratio in § 841 on several occasions based on the same reasoning used by Smith. In *United States v. Levy,* 904 F.2d 1026 (6th Cir.1990), *cert. denied,* 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991), the defendant challenged the 100:1 ratio in 21 U.S.C. § 841 and alleged that the term "cocaine base" was unconstitutionally vague. This court rejected the challenge. *Id.* at 1033. In so holding, this court explained: "It is undisputed that Congress amended [21 U.S.C. § 841(b)(1)(B) ] out of concern that cocaine base is 'more dangerous to society than cocaine [powder] because of crack's potency, its highly addictive nature, its afford-

ability, and its increasing prevalence.'" *Id.* at 1032 (brackets added and in original) (quoting *United States v. Buckner,* 894 F.2d 975, 978 (8th Cir.1990)).

The court further found:

In broad terms, cocaine base and cocaine hydrochloride may be distinguished by their texture and chemical composition. Cocaine hydrochloride is water soluble, formed in crystals or flakes, and is generally snorted by users. Cocaine base is not water soluble, is concentrated in rock-hard forms of various sizes, and is generally smoked. Thus, the phrase cocaine base defines a substance that is distinguishable from other forms of cocaine based upon appearance, texture, price, means of consumption, the character and immediacy of the effects of use, and chemical composition.

*Id.* at 1033 (citations omitted).

Also, in *United States v. Pickett,* 941 F.2d 411 (6th Cir.1991), this circuit held that the 100:1 ratio in 21 U.S.C. § 841 does not violate substantive due process because Congress did not act arbitrarily or irrationally when it established the ratio. *Id.* at 418. Relevant to Smith's arguments on appeal, the *Pickett* court found that

there is sufficient difference of opinion in the scientific community regarding the different likelihoods of becoming addicted to crack or cocaine to justify the Congressional distinction between the two.... [E]xperts believe that the speed with which crack gets to the brain produces a significantly different effect that increases the likelihood of addiction. There was also evidence produced [at the sentencing hearing] that crack is usually a purer drug than is cocaine.

*Id.*

Most notably, this court in *United States v. Salas,* No. 93–5897, 1994 WL 24982, 1994 U.S.App. LEXIS 1515 (6th Cir. Jan. 27, 1994) (unpublished disposition), held:

The Sentencing Guidelines do not establish the illegality of any conduct. Rather, they are directives to judges and not to citizens. As such, they are not susceptible to a

vagueness attack. Since there is no constitutional right to sentencing guidelines, the limitations placed on judges' discretion by the Guidelines do not violate a defendant's right to due process by reason of vagueness.

*Id.* at *2, 1994 U.S.App. LEXIS at *4–5.

■ Custom and tradition in the various circuits of the United States Court of Appeals dictate that one panel of a circuit court will not overrule the decision of another panel; only the court sitting *en banc* may overrule a prior decision of a panel. *See, e.g., Shattuck v. Hoegl,* 523 F.2d 509 (2d Cir. 1975).

The Sixth Circuit has long adhered to this venerable principle. According to *Salmi v. Secretary of Health and Human Services,* 774 F.2d 685, 689 (6th Cir.1985): "A panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Id.* The latest version of the Sixth Circuit Policies instruct:

"Reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court en banc consideration is required to overrule a published opinion of this court." Court Policies, § 10.2 (Spring 1991).

■ We reject the defendant's challenge to section 2D1.1 of the Sentencing Guidelines. Smith asks this court to review its holding in *Levy* because the "decision was made without the benefit of scientific data" and is therefore "subject to revision." Pursuant to established case law and this circuit's policies, this court would have to revisit the rationale behind *Levy* and *Pickett* in order to find merit in the defendant's argument on this issue. This, we are forbidden to do. Moreover, according to our decision in *Salas,* the Sentencing Guidelines are not subject to a vagueness challenge.

Accordingly, the judgment of the district court is **AFFIRMED.**

NATHANIEL R. JONES, Circuit Judge, concurring.

I concur in the result, but am compelled to discuss my concerns regarding the impact of the 100:1 sentencing ratio for crack and powdered cocaine ("100:1 ratio") that exists in both statutory law and the Sentencing Guidelines. The ratio has an acute societal impact which continues to expand. Nevertheless, this court has determined that the ratio passes constitutional muster. I believe that with the benefit of new information and the application of the ratio, the time has come for the court to reexamine its supporting analysis. As judges, we should no longer remain wedded to that which experience shows is neither rational nor fair.

The 100:1 ratio was created by the Anti–Drug Abuse Act of 1986 ("Act"). Congress passed the Act in order to respond to the public's growing fear of the "crack epidemic." Laura A. Wytsema, Comment, *Punishment for "Just Us"—A Constitutional Analysis of the Crack Cocaine Sentencing Statutes,* 3 Geo. Mason Indep.L.Rev. 473, 477 n. 24 (1995); Knoll D. Lowney, *Smoked Not Snorted: Is Racism Inherent in Our Crack Cocaine Laws?,* 45 Wash. U.J. Urb. & Contemp.L. 121 (1994) (see text preceding n. 108). In 1988, Congress amended the Act to establish a mandatory minimum penalty for possession of crack, which is "the only such federal penalty for a first offense of simple possession of a controlled substance." *U.S. Sentencing Commission: Executive Summary of Special Report on Cocaine and Federal Sentencing Policy,* 56 Crim. L. Rptr. (BNA) 2159, 2161 (Mar. 1, 1995) (hereinafter *Executive Summary* ). The United States Sentencing Commission subsequently incorporated the ratio into the Sentencing Guidelines. *See* U.S. Sentencing Comm'n Guidelines Manual § 2D1.1 (c)(1) (Nov.1994).

Since the Act's passage, the African–American community has borne the brunt of enforcement of the 100:1 ratio. From 1985 to 1986, the number of minority youth detained for drug offenses increased 71%. Lowney, *supra,* at n. 64. By 1994, blacks comprised 90.4% of all federal crack cocaine drug offenders. "Sentencings Drop By 2,000", *Guide Lines,* June 1995 at 4 (hereinafter

"Sentencings"). From 1992 to 1994, the percentage of drug prosecutions involving crack offenses increased from 14.6% to 21.2%. "Sentencings" at 4. Therefore, the Act has resulted in an increasingly disproportionate number of young black males being prosecuted and incarcerated for a considerable amount of time, to the point that blacks, who comprise 12% of the population, now make up 57.7% of the prisoners in federal jails for drug offenses.

The racial disproportionality of crack-related prosecutions is even more disturbing in light of the harsher sentences for crack offenses. The mean sentence for crack traffickers, most of whom are black, is 133.4 months. *Id.* In contrast, powdered cocaine traffickers receive a mean sentence of approximately ninety months. *Id.* The majority of these offenders are white (32%). United States Sentencing Com'n Report at 156. Similarly, for simple possession offenses, crack offenders receive a sentence which is nearly ten times longer than that received for cocaine offenders: the mean sentence for crack possession offenders is 30.6 months, while that for cocaine offenders is 3.2 months. U.S. Sentencing Com'n Report at 154. Yet 73.8% of cocaine possession offenders obtain supervised release while only 32% of crack possession defenders are granted parole. *Id.* at 156. Thus, the numbers clearly illustrate the disparities in prosecutions, sentencing, and probation between cocaine offenders, who are mostly white, and crack offenders, who are mostly black, since the 100:1 ratio came into being.

In recent years we have rejected a variety of constitutional claims against the 100:1 ratio. In *United States v. Levy,* 904 F.2d 1026, 1033 (6th Cir.1990), *cert. denied,* 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991), we held that the ratio as embodied in 21 U.S.C. § 841(b)(1)(B) was not unconstitutionally vague. The majority relies in great part on that decision. Moreover, in *United States v. Pickett,* 941 F.2d 411, 419 (6th Cir.1991), we declined to hold the ratio unconstitutional under the Eighth Amendment because we concluded that the ratio is not so disproportionate as to constitute cruel and unusual punishment under the Eighth Amendment.

Furthermore, in *United States v. Little,* 10 F.3d 1197, 1210 (6th Cir.1993), *cert. denied,* ____ U.S. ____, 114 S.Ct. 1569, 128 L.Ed.2d 213 (1994) and *United States v. Williams,* 962 F.2d 1218 (6th Cir.), *cert. denied,* 506 U.S. 892, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992), we employed the "rational basis" standard of review; subsequently, we rebuffed challenges to the 100:1 ratio under the Equal Protection Clause of the Fifth Amendment because we held that the ratio was reasonably related to a legitimate government interest. Similarly, in *Pickett,* 941 F.2d at 418 and *United States v. Abrams,* Nos. 90–3973/74, 1991 WL 164327 (6th Cir. Aug. 21, 1991) (unpublished per curiam), *cert. denied,* 502 U.S. 1044, 112 S.Ct. 903, 116 L.Ed.2d 804 (1992), we employed a virtually identical rational basis test to reject substantive due process challenges to the ratio.

In rejecting these challenges to the 100:1 ratio, we have relied on three premises. The first premise is that crack cocaine is "a substance that is distinguishable from other forms of cocaine based on appearance, texture, price, means of consumption, the character and immediacy of the effects of use, and chemical composition." *Levy,* 904 F.2d at 1033. The second premise is that "crack is a purer drug than cocaine and the speed with which it progresses to the brain 'produces a significantly different effect that increases the likelihood of addiction.'" *Williams,* 962 F.2d at 1227 (quoting *Pickett,* 941 F.2d at 418). The final premise is that the cheapness and accessibility of crack " 'could create other societal problems which required remedying,'" including the exposure of children to the drug. *Id.* The ever-expanding body of evidence, however, suggests that these premises lack saliency so as to cast considerable doubt on this court's legal analysis.

The first premise requires us to conclude that crack cocaine and powdered cocaine are pharmacologically distinct drugs. *Levy,* 904 F.2d at 1033. The empirical and scientific data suggests the contrary. Crack and powdered cocaine are each comprised of cocaine hydrochloride. Powdered cocaine is consumed intranasally, while crack is smoked.

Crack, however, is mixed with solvents such as baking soda, and this mixture produces a concentrated crystalline substance. The distinction in the physical properties of crack cocaine notwithstanding, "[c]ocaine in any form—paste, powder, freebase, or crack—produces the same physiological and psychotropic effects." *Executive Summary, supra* at 2163; *see also* Lowney at 9. Dr. Charles Shuster, former Director of the National Institute on Drug Abuse, puts it more bluntly: " 'cocaine is cocaine, whether you take it in intranasally, intravenously, or smoked.' " *Crack Cocaine: Hearing Before the U.S. Sentencing Com'n* 112 (Nov. 9, 1993), *quoted in The Disparity in Sentencing Between Crack and Powder Cocaine: Hearings Before the Subcomm. on Crime of the House Comm. on the Judiciary* 18 (June 29, 1995) (statement of Wade Henderson, Director NAACP Washington Bureau) (hereinafter Henderson). Therefore, while crack and powdered cocaine are distinguishable in form and in price, they are essentially the same drug.

The second premise is that crack is more addictive than powdered cocaine. *Williams,* 962 F.2d at 1227. This premise is also suspect. Experts have noted that crack users absorb the cocaine into their bloodstream more quickly than those who snort powdered cocaine. *See* Matthew F. Leitman, *A Proposed Standard of Equal Protection Review for Classifications within the Criminal Justice System that have a Racially Disparate Impact: A Case Study of the Federal Sentencing Guidelines' Classification Between Crack and Powder Cocaine,* 25 U. Tol. L.Rev. 215 (1994). In turn, a "high" produced by smoking crack peaks within a minute of smoking, while the "high" produced by powdered cocaine peaks after twenty minutes. Lowney, *available in* LEXIS at *10. The crack high decreases within forty minutes while the powdered cocaine high lasts for two hours. *Id.* Because crack produces quicker highs and lows than does powdered cocaine, it is estimated that the likelihood of addiction to crack is fifty times higher than that of powdered cocaine. Leitman, *available in* LEXIS at *13.

Although crack's addictive qualities are not at issue, the assertion that crack is a more dangerous drug than cocaine is suspect. According to Dr. George Schwartz, a noted expert in the field of pharmacology and toxicology, crack is no more or less addictive than powdered cocaine. Henderson at 19 (citing Proffer of Dr. George Schwartz, attached to Defendant's Motion to Declare Provisions of 21 U.S.C. § 844(a) Unconstitutional, *United States v. Maske,* 840 F.Supp. 151 (D.D.C.1993)). In fact, much of the data on crack cocaine suggests that the contrary might be true. Government statistics show that cocaine is a more popular drug than crack: as of 1994, there were five times more powdered cocaine users than crack users. U.S. Bureau of Justice Statistics, U.S. Dept. of Justice, *Drugs, Crime, and the Justice System,* NCJ–133652/81 at 24 (Dec.1992); Henderson at 27. The death rate among powdered cocaine users is three times higher than the rate for crack users. In addition, powdered cocaine poses a greater risk of heart and lung disease than crack. U.S. Bureau of Justice Statistics at 19. Thus, while crack has some undeniably addictive and dangerous qualities, the evidence on powdered cocaine makes it increasingly difficult for me to understand why crack cocaine offenders receive significantly higher sanctions than powdered cocaine offenders.

The final, and perhaps most controversial, premise is that crack cocaine poses a greater threat to the fabric of our society than powdered cocaine. *See Pickett,* 941 F.2d at 418. Concededly, this premise is not totally meritless. "The distribution environments [in which crack is sold], by their very nature, are highly susceptible to conflict and intense competition." *Executive Summary* at 2165. Crack is distributed through open-air sales, couriers, and crack houses. *Id.* One gram of crack provides approximately twenty to twenty-five "hits", thus enabling crack vendors to carry and sell their illicit product more easily than powdered cocaine dealers. Leitman, *available in* LEXIS at *14. These characteristics make the crack trade lucrative, and breed violent competition. This danger is reflected in the statistic which reveals that while 27.9% of all crack offenders carry weapons, only 15.1% of powdered co-

caine offenders do so. *Executive Summary* at 2165.

Other commonly held perceptions about the evils of crack, however, may be exaggerated. For example, a key factor in the passage of the Act was the impression held by many lawmakers that crack addicts are wont to commit violent crimes.[1] The Sentencing Commission, however, found that while crack addicts resort to drug dealing and petty crimes to support their habits, "the stereotype of a drug-crazed addict committing heinous crimes is not true for either [crack or powdered] cocaine." *Executive Summary* at 2166.

Another perception is that crack is responsible for a marked increase in the births of "boarder babies"—commonly called "crack babies"—particularly among African–American women. *Id.* at 2166–67. The Sentencing Commission found that pregnant women who use crack put their babies at a greater health risk because they consume greater quantities of cocaine than powdered cocaine users. *Id.* But the Sentencing Commission also found that there is no reliable data to establish that crack contributes to more births of "cocaine-exposed babies" than powdered cocaine. *Id.* Further complicating this issue is the fact that doctors are ten times more likely to report black women for abusing drugs during pregnancy than white women. Ron Harris, *Blacks Feel Brunt of Drug War*, N.Y. Times, Apr. 22, 1990, at A1.

Of all the perceptions that exist about the societal impact of crack, the most significant perception is that crack is directly responsible for the deterioration of the African-American community. Leitman, *available in* LEXIS at *6. Although crack has undoubtedly taken its toll on this community, powdered cocaine may have an equally devastating, if not more devastating, impact.

Powdered cocaine is the illicit ingredient in crack cocaine; crack cannot be manufactured without it. *Executive Summary* at 2164. Powdered cocaine reaches the open-air crack distribution market "at the wholesale and retail levels." *Id.* It also pervades the more discreet markets in mostly white, suburban communities. Alfred Blumstein, *Racial Disproportionality of U.S. Prison Populations Revisited,* 64 U. Colo. L.Rev. 743, 753 (1993). Despite the ubiquity of powdered cocaine, however, powdered cocaine dealers are not punished as harshly as crack cocaine dealers. As the Sentencing Commission succinctly noted, "the substantial differential in the ratio between crack and powder cocaine punishes the retail dealer of crack far more severely than the powder cocaine supplier who may have sold the powder cocaine from which multiple street dealers made crack." *Executive Summary* at 2169.

The emphasis on crack and its contribution to urban decay also diverts attention from the other socioeconomic symptoms which contribute to the deterioration of the African-American community. There exists a common perception that "the drug trade has overwhelmed many urban black communities, wiping out legitimate businesses and steering young men to crime." David G. Savage, *1 in 4 Young Blacks in Jail or in Court Control, Study Says*, L.A. Times, Feb. 27, 1990, at A1. Other commentators, however, suggest the opposite: "past discrimination in housing, employment, and education has contributed to the creation of a black underclass...." Leitman, *available in* LEXIS at *5. As a result, the young black males who are overwhelmingly attracted to the drug trade "are too often socialized to believe that they can only achieve the American dream through illegal activities ..." *Id.* Consequently,

---

1. A number of legislators spoke of crack's link to crime during the passage of the Act. In his support of the Act, Senator Lawton Chiles expressed concern over the "growing crime rates in urban as well as rural areas." 132 Cong. Rec. S12169–01 (daily ed. Sept. 9, 1986) (statement of Sen. Chiles). Congressman Craig Biaggi maintained that the crack epidemic was "sending our crime rates sky high." 132 Cong. Rec. at 15659 (daily ed. June 26, 1986) (statement of Rep. Biaggi). Furthermore, in his testimony before the

House Judiciary Subcommittee on Crime, Wade Henderson, Director of the Washington, D.C. Bureau of the NAACP, invoked the testimony of Eric Sterling, who served as the subcommittee's counsel during passage of the Act. Henderson at 12–13. According to Mr. Sterling, members of the House of Representatives submitted articles about " 'crazed black men killing innocent people while on cocaine' " into the Congressional Record during deliberations over the Act. *Id.*

"[c]rack distribution .... provide[s] inner-city black males with a unique chance to make money and attain stature in their community." *Id.* Thus, it is quite possible that Judge Heaney was right when he wrote in his concurrence in *United States v. Willis,* 967 F.2d 1220, 1227 (8th Cir.1992) (Heaney, J. concurring), that "until young black men have equal opportunities for a decent education and jobs, [the drug problem] will only get worse."

The current enforcement and sentencing policies may in fact be substantial factors in the persistence of the "crack epidemic" in the African–American community. These policies have resulted in the incarceration of scores of young black males, many of whom will remain in prison until they reach middle age. Leitman, *available in* LEXIS at *7. During their extended periods of incarceration, " 'their peers are beginning families, learning constructive life skills, and starting careers.' Thus, the longer [they are] in jail, the greater the competitive disadvantage they will suffer upon their release." *Id.* Therefore, these young men will lack the wherewithal to help later generations avoid the perils of illegal activity, thereby exposing the community to continued drug-related crime. *Id.*

Finally, the crack sentencing policies may perpetuate the problems they seek to resolve because of their provocative racial overtones. The longer the policies exist, the greater the risk that we send a message to the public that "the lives of white criminals are considered by the U.S. justice system to be at least 100 times more valuable and worthy of pres-ervation than those of black criminals." Keith Owens, *Crack in the System; Bias in Drug Laws Sends More Blacks to Jail,* The Dallas Morning News, October 25, 1995, at A27. This sentencing inequity presents a greater danger that black males will hold our judicial system in greater contempt and become increasingly attracted to the crack distribution as a career opportunity. *See* Henderson at 10; Leitman, *available in* LEXIS at *7. With one-third of our black males already under the supervision of the criminal justice system, the 100:1 ratio may drive a wedge between our young black males and our justice system which will inure to the benefit of neither. We can ill afford this costly disconnect.

Therefore, with the benefit of this further examination, I regard the premises which drive our constitutional analysis of the 100:1 ratio with great suspicion. Each of these premises is subject to challenge, and we must not ignore this fact.[2] I urge my colleagues to don a more realistic set of lenses. Otherwise, we risk substantial harm to the integrity of our constitutional jurisprudence. Continued use of the law to perpetuate a result at variance with rationality and common sense—even in a war on drugs—is indefensible. We have seen instances of this being done in our nation's past that have come back to haunt us. I predict that unless we apply the lesson of *Toyosaburo Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944)[3], for instance, we will be forced to relive that tragedy.

Once again, I offer Lord Atkins' warnings to his fellow countrymen during World War

---

2. Despite the questionable policy justifications for the 100:1 ratio, it remains the controlling policy. In March of 1995, the Sentencing Commission recommended revisions to the 100:1 ratio as it exists in the Sentencing Guidelines. *Executive Summary* at 2171. The Senate rejected the recommendation on September 29, 1995; the House of Representatives followed suit on October 18, 1995. *Abraham Bill Passes Friday Night as Senate Rejects Sentencing Commission's Lighter Sentences,* PR Newswire, Sept. 29, 1995; *House Blocks Reduced Crack Cocaine Penalty,* The Palm Beach Post, October 22, 1995 at 5F. President Clinton signed the bill rejecting the recommendation on October 31, 1995. Ann Devroy, *Clinton Keeps Stiff Sentences for Crack,* International Herald Tribune, Nov. 1, 1995.

3. In *Korematsu,* the Court upheld the constitutionality of Executive Order No. 34, which resulted in the internment of Japanese–Americans. *Id.* The Court found that the Executive Branch and Congress had sufficient grounds to promulgate such an order. *Id.* at 218, 65 S.Ct. at 194–95. It explained that "there were disloyal members of [the Japanese-American] population; whose number and strength could not be readily ascertained ... such persons ... constituted a menace to the national defense and security, which demanded that prompt and adequate measures be taken against it." *Id.*

II: "In England, amidst the clash of arms the laws are not silent. They may be changed, but they speak the same language in war as in peace." I argue for change with respect to imposing sentences that yield a wretchedly unfair result. I do this as a virtual single voice. Yet, as Lord Atkins also said, "I protest, even if I do it alone, against a strained construction put upon words, with the effect giving uncontrolled power of imprisonment to the minister." As a court, in the name of justice, we must revisit without delay this issue, in light of its impact on imprisonments.