CLAY, Circuit Judge,
dissenting.
The Fair Sentencing Act (“FSA”), Pub.L. No. 111-220, 124 Stat. 2372 (2010), was passed by Congress in 2010 to reinstill some semblance of fairness and equality to a system plagued by inequality and injustice. Under the majority’s interpretation of this statute, however, thousands of individuals, predominately African Americans from low-income communities like Cornelius Blewett and Jarreous Blewitt (“the Blewetts”), are foreclosed from obtaining the benefits of the FSA. Instead, the majority reads the FSA to further the injustice that has existed in the crack cocaine sentencing system for over twenty years. Under this reading, individuals like the Blewetts will continue to be incarcerated in a disproportionate, unjustified manner, in violation of their rights under the Equal Protection Clause. Because I disagree with the majority’s characterization of the FSA’s retroactivity and believe this Court’s opinion furthers the injustice that has resulted from such an unequal sentencing regime, I respectfully dissent.
With the Anti-Drug Abuse Act of 1986 (“1986 Drug Act”), Pub.L. No. 99-570, 100 Stat. 3207 (1986), Congress created an unequal sentencing regime designed to punish drug offenders more heavily “depending primarily upon the kind and amount of drugs involved in the[ir] offense.” Dorsey v. United States, — U.S.-, 132 S.Ct. 2321, 2327, 183 L.Ed.2d 250 (2012). Because this regime established a 100-to-l sentencing ratio between crack and powder cocaine, a crack cocaine offender possessing five grams of crack with intent to distribute received a five-year mandatory minimum sentence while such a sentence was only applied to a powder cocaine offender in possession of 500 grams of powder cocaine with intent to distribute. Id. Under this regime, the mean sentence for crack cocaine offenders was 133.4 months, while powder cocaine offenders “receive[d] a mean sentence of approximately [90] months.” United States v. Smith, 73 F.3d 1414, 1419 (6th Cir.1996) (Jones, J., concurring) (citing Sentencings Drop by 2, 000, GUIDELINES, June 1995 at 4).
Although, at that time, this ratio may have been deemed necessary in some quarters to confront the troubling rise of *676 crack cocaine, the rationale behind such a sentencing disparity has since been debunked and has been abandoned by most of the parties originally in favor of the 1986 statute. 156 Cong. Reo. H6202 (daily ed. July 28, 2010) (statement of Rep. Robert C. “Bobby” Scott, Chairman, H. Sub-comm. on Crime, Terrorism, Homeland Sec., and Investigations of the H. Comm, on the Judiciary) (“We are not blaming anybody for what happened in 1986, but we have had years of experience and have determined that there is no justification for the 100-to-l ratio.”). See also 155 Cong. Reo. S10491 (daily ed. Oct. 15, 2009) (statement of Sen. Durbin) (“Vice President Joe Biden, one of the authors of the legislation creating this disparity in sentencing, has said: ‘Each of the myths upon which we based the disparity has since been dispelled or altered.’ ”).
In 2010, after years of reports from the United States Sentencing Commission (“Sentencing Commission”) and criticism from parties on all sides of the American legal system, including the law enforcement community, Congress finally heeded the loud call for reform by enacting the FSA. Among other things, this statute greatly reduced the ratio for mandatory minimum sentencing between crack and powder cocaine from 100-to-l to 18-to-l and instructed the Sentencing Commission to create sentencing guidelines consistent with those new mandatory mínimums. Dorsey, 132 S.Ct. at 2829. The Sentencing Commission did as instructed by designing sentencing guidelines in tandem with Congress’ new mandatory mínimums and explicitly making the guidelines retroactive. Id. at 2336. Therefore, the FSA replaced the harsh and unjust mandatory míni-mums and the mandatory mínimums led to new sentencing guidelines, which are expected to reduce future sentences for low-level drug offenders and have the potential to mitigate some of the past injustice associated with the 1986 Drug Act.
The Blewetts are two African American drug offenders who received ten-year sentences under the 1986 Drug Act’s mandatory minimum for possession of crack cocaine with the intent to distribute. Under the FSA’s new sentencing requirements, however, their offenses would not warrant application of the old mandatory minimum sentences. Therefore, despite being sentenced prior to Congress’ enactment of the FSA, the Blewetts sought sentence reductions under the statute’s new mandatory mínimums. When the district court denied their motions, they appealed their case, bringing an important question before this Court: whether the FSA’s new mandatory mínimums, which were designed to avoid the disparities and inequality associated with the old 100-to-l regime, should apply retroactively to individuals like the Blewetts, who were sentenced prior to the FSA’s enactment.
While the majority adopts the government’s position that Congress did not intend for these mandatory minimums to be applied retroactively to individuals already sentenced and serving out their time under the 1986 Drug Act, the constitutional guarantees of equal protection compel a contrary reading — that the mandatory minimums designed by Congress to remedy past injustices are retroactive and provide relief to individuals like the Blewetts.
We do not purport to devise a procedural mechanism for implementing the retroactive application of the FSA. Although the other separate opinions in this case attempt to address that issue, and the matter of whether the availability of § 3582(c)(2) may be a viable approach, the objective of this opinion is limited to addressing the issue of whether a failure to grant retroactivity constitutes an equal protection violation under circumstances *677 where untold thousands of individuals remain imprisoned under old mandatory minimum sentences pursuant to a sentencing regime rife with inequities and discrimination.
I. The 100-to-l Ratio is Unsupported by Penological or Pharmacological Interests
Each of the justifications originally presented in support of the 1986 Drug Act’s disparity between crack and powder cocaine sentencing has since been debunked.[1] The original disparity was justified by what appeared to be an important pharmacological difference between crack and powder cocaine as well as a fear of greater violence surrounding dealings and use of crack cocaine versus powder cocaine. USSC, Special RepoRt to Congeess: CoCaine and Federal Sentencing Policy 8 (May 2007) (2007 Report) [hereinafter Cocaine and Federal Sentencing Policy (May 2007) ]. However, as Republican Representative, Daniel Lungren, stated in support of the FSA, “We initially came out of committee with a 20-to-l ratio. By the time we finished on the floor, it was 100-to — 1. We didn’t really have an evidentiary basis for it, but that’s what we did, thinking we were doing the right thing at the time.” 156 Cong. Rec. H6202 (daily ed. July 28, 2010) (statement of Rep. Lun-gren). Mr. Elmore Briggs, Director of Clinical Services at the District of Columbia Department of Health, Addiction, Recovery, and Prevention Administration, has concluded that despite differences in mechanisms for delivery of crack and powder cocaine into the body, “trafficking sentencing should be equalized for cocaine regardless of the form of drug.” Cooaine and Federal Sentenoing Polioy, at B-10 (May 2007).[2] In a 2002 statement submitted to the Sentencing Commission, 28 former United States Attorneys serving as United States Circuit Court of Appeals and District Court judges stated “that the ‘current disparity between powder cocaine and crack cocaine, in both the mandatory minimum statutes and the guidelines, cannot be justified and results in sentences that are unjust and do not serve society’s interest.’ ” USSC, Report to the Congress: COCAINE AND FEDERAL SENTENCING POLICY 2 (May 2002) (2002 Report). Members of *678 Congress have similarly acknowledged that there is no pharmacological basis for the large disparity in sentencing between crack and powder cocaine. For example, during a 2009 Senate hearing considering adoption of the FSA, Senator Dick Durbin recalled that he and fellow members of Congress irrationally feared crack cocaine in the mid-to-late 1980s as it “had just appeared on the scene and it scared us, because it was cheap and it was addictive. We thought it was more dangerous than many narcotics and left the legacy of crack babies and broken lives.” 156 Cong. Rec. S1680 (daily ed. March 17, 2010) (statement of Sen. Durbin). However, he stood before the Senate in 2010 requesting unanimous approval of the FSA, which would rescind the old mandatory mínimums enacted in 1986 as a response to the advent of crack cocaine and the fear associated with the new drug and “immediately ensure that every year, thousands of people are treated more fairly in our criminal justice system.” Id. at S1681.
Additionally, members of Congress and the legal and criminal justice communities, including the “bipartisan U.S. Sentencing Commission, the Judicial Conference of the United States, the National District Attorneys Association, the National Association of Police Organizations, the Federal Law Enforcement Officers Association, the International Union of Police Associations, and dozens of former Federal judges and prosecutors ...” have recognized that there is no penological evidence supporting the continued application of the old mandatory mínimums that created such huge disparities in sentencing. 156 Cong. Reo. H6203 (daily ed. July 28, 2010) (statement of Rep. Hoyer). The Honorable Reggie B. Walton, United States District Judge for the District of Columbia, testified before the Senate Subcommittee on Crime and Drugs that “[he saw] no greater level of violence in reference to the cases that c[a]me before [him] involving crack cocaine as compared to any other drug.” Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing Before the S. Subcomm. on Crime and Drugs of the S. Comm, on the Judiciary, 111th Cong. 7 (April 29, 2009) [hereinafter Restoring Fairness to Federal Sentencing] (statement of the Honorable Reggie B. Walton, United States District Judge for the District of Columbia). The penological interests that once motivated the large disparity in crack and powder cocaine sentencing can no longer justify such harsh sentences. Dr. Alfred Blumstein, Professor of Urban System and Operations Research at Carnegie Mellon University, testified before the Sentencing Commission that “the maturation and stabilization of the crack cocaine market has had an important effect in reducing the level of violence,” indicating that the fears of greater violence surrounding crack cocaine are no longer based in fact. Cocaine and Federal Sentencing Policy, at B-13 (May 2007).[3] Dr. Bruce Johnson, Director of the Institute for Special Populations Research at the National Development and Research Institutes echoed this perspective when he suggested replacing the 100-to-1 drug quantity ratio with either a 10-to-1 or a 2-to-1 drug quantity ratio to more appropriately capture the respective safety concerns surrounding crack and powder cocaine. Id. at B-15.
II. Racial Disparities in Sentencing
Even more disconcerting than the lack of evidence to support the great disparity *679 in cocaine offense sentencing is the disparate impact such sentences have had on low-income, African American communities. Representative Bobby Scott, speaking on the floor of the House of Representatives, stated that “[the] disparity is particularly egregious when you consider that the Sentencing Commission has concluded that there is no pharmacological difference between the two forms of cocaine, and that 80 percent of the crack defendants are black, whereas only 30 percent of the powder cocaine defendants are black.” 156 Cong. Rec. H6197 (daily ed. July 28, 2010) (statement of Rep. Scott). Representatives Sheila Jackson Lee and Steny Hoyer also highlighted the disproportionate impact of the crack-powder disparities on low-income communities of col- or. Id. at H6199 (statement of Rep. Jackson Lee) (“I will say to you that this fell heavily on the poor African American and Hispanic communities.”); id. at H6203 (statement of Rep. Hoyer) (“It has long been clear that 100-to-l disparity has had a racial dimension as well, helping to fill our prisons with African Americans disproportionately put behind bars for longer.”).
Dr. Peter Reuter, Professor in the School of Public Policy and the Department of Criminology at the University of Maryland, confirmed the disparate impact on African Americans when he testified that “the disparity in sentences produced a tragic disproportion in the share of crack cocaine prison time served by African Americans.” Cocaine And Federal Sentencing Policy, at B-16 (May 2007). In 1993, although the majority of crack cocaine users were white, “[b]lack defendants accounted for 88 percent of all federal convictions for crack distribution.... ” Stuart Taylor, Jr., Courage, Cowardice on Drug Sentencing, Legal Times (April 24, 1995). Therefore, under the 100-to-1 regime, which requires a sentence three to eight times longer for crack than for powder cocaine, the sentences for African Americans tended to be far longer on average than sentences for white powder cocaine offenders. As Senator Durbin stated before the Senate,
Disproportionately, African Americans who are addicted use crack cocaine. The use of powder cocaine is spread across the population among Whites, Hispanics, and others. So the net result of this was that the heavy sentencing we enacted years ago took its toll primarily in the African-American community. It resulted in the incarceration of thousands of people because of this heavy sentencing disparity and a belief in the African-American community that it was fundamentally unfair. It was the same cocaine, though in a different form, and they were being singled out for more severe and heavy sentences.
156 Cong. Rec. S1680-81 (daily ed. March 17, 2010) (statement of Sen. Durbin).
Members of Congress were emphatic in suggesting that these racial disparities in cocaine sentencing produced equal protection problems. Representative Ron Paul stated on the floor of the House of Representatives that “[the FSA] makes an attempt to correct a very, very serious problem in equal justice in our systems.... ” 156 Cong. Rec. H6203 (daily ed. July 28, 2010) (statement of Rep. Paul). Senator Patrick Leahy also stated that “[t]he racial imbalance that has resulted from the cocaine sentencing disparity disparages the Constitution’s promise of equal treatment for all Americans.... [The FSA] reduces the disparities that leave some in jail for years while their more privileged counterparts go home after relatively brief sentences.” 156 Cong. Reo. S1682 (daily ed. Mar. 17, 2010) (statement of Sen. Leahy, Chairman, S. Comm, on the Judiciary). The racial disparities inherent in the old *680 sentencing regime create an equal protection issue and a human rights issue, which could be resolved by retroactive application of the FSA’s new sentencing ratio. Restoring Fairness to Federal Sentencing, at 3 (statement of Sen. Durbin, Chairman, S. Subcomm. on Crime and Drugs of the S. Comm, on the Judiciary) (“Our record-high incarceration rates and the racial disparities in our criminal justice system are human rights issues that we must face honestly.”).
III. Equal Protection Analysis
The Equal Protection Clause stipulates that “[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws” and these protections apply equally against acts of state governments and the federal government. U.S. const. amend. XIV, § 1; Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954); United States v. Paradise, 480 U.S. 149, 166 n. 16, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (plurality opinion). Under these equal protection principles, “ ‘all persons subjected to ... legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed.’ ” Engquist v. Or. Dep’t of Agric., 553 U.S. 591, 602, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (quoting Hayes v. Missouri, 120 U.S. 68, 71-72, 7 S.Ct. 350, 30 L.Ed. 578 (1887)).
The concerns leading to the passage of the Thirteenth, Fourteenth, and Fifteenth Amendments are particularly relevant in the context of legislation that draws distinctions based on race and disproportionately impacts African Americans. Bell v. Maryland, 378 U.S. 226, 289, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) (Goldberg, J., concurring). At the heart of equal protection is an intent to eradicate racial disparity in treatment under the law. “Such opinions immediately following the adoption of the Amendments clearly reflect the contemporary understanding that they were ‘to secure to the colored race, thereby invested with the rights, privileges, and responsibilities of citizenship, the enjoyment of all the civil rights that, under the law, are enjoyed by white persons....’” Id. (quoting Neal v. Delaware, 103 U.S. 370, 386, 26 L.Ed. 567 (1880)).
Although the FSA is not facially discriminatory, an interpretation of the FSA foreclosing the retroactive application of its new mandatory mínimums would present an equal protection problem inasmuch as it would subject a group that is overwhelmingly predominately African American to starkly different treatment under the law. Such an interpretation can meet neither strict scrutiny nor rational basis review and should therefore be avoided by this Court.
A. Strict Scrutiny
Although the FSA is neutral on its face and a decision regarding the retroactivity of the mandatory mínimums would also be facially neutral, the majority’s interpretation of the FSA’s retroactivity poses serious constitutional concerns. A law presents an equal protection violation and must therefore be struck down or read differently if it is motivated by a racially discriminatory purpose and has a disparate impact on an identifiable group. City of Mobile v. Bolden, 446 U.S. 55, 62, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The Supreme Court explained in Vill. of Arlington Heights v. Metro. Hous. Dev. Corp. that “[t]he impact of the official action whether it ‘bears more heavily on one race than another,’ may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legis *681 lation appears neutral on its face.” 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (quoting Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)).
The 100-to-l ratio under the 1986 Drug Act clearly disproportionately impacts African Americans without any evidentiary basis in science or criminal justice theory. In 1993, for example, black and Hispanic individuals accounted for over 95% of the offenders who were convicted for crack distribution. United States v. Then, 56 F.3d 464, 467 (2d Cir.1995) (Calabresi, J., concurring) (citing USSC, Special Report to Congress: Cocaine and Federal Sentencing PoliCy 192 (Feb.1995) (1995 Report)). Although the proportion of crack cocaine offenders who are African American has declined since 1992, the proportion still remained at 81.8% of the total crack cocaine offender population in 2006. Cocaine AND FEDERAL SENTENCING POLICY, at 15 (May 2007). In 2010, Congress acted, in large part, to rectify this injustice and to equalize the crack and powder cocaine sentencing regime that had been criticized on all fronts. In fact, “African Americans serve almost as much time in Federal prison for a drug offense (58.7 months) as whites do for a violent offense (61.7 months), largely due to sentencing laws such as the 100-to-1 crack-powder cocaine disparity.” H.R. Rep. No. 111-670, at 4 (2010).
Of course, this information was known to Congress prior to the FSA’s enactment. In fact, on a number of occasions, this Court and other circuits considered this information and ultimately held that the disparities in sentencing alone were not sufficient to amount to an equal protection violation. See, e.g., United States v. Blair, 214 F.3d 690, 702 (6th Cir.2000); United States v. Burgos, 94 F.3d 849, 876 (4th Cir.1996).[4] However, the legislative enactment of the FSA rendered the old case law obsolete. As early as 1995, it appeared that viable constitutional arguments might arise in the future to challenge the inequality inherent in the 100-to-1 disparity. Then, 56 F.3d at 467 (Calabresi, J., concurring). In his concurring opinion in Then, Judge Calabresi recognized that the disproportionate sentencing ratio was seemingly justified at the time it was adopted, and “the link between foreseeable discriminatory impact and motive was insufficient to establish the kind of discriminatory intent on the part of Congress or the Commission that is needed to support [an] equal protection claim.” Id. However, he also suggested that “what is known today about the effects of crack and cocaine, and about the impact that the crack/cocaine sentencing rules have on minority groups, is significantly different from what was known when the 100-to-1 ratio was adopted.” Id. See also Smith, 73 F.3d at 1419-1421 (Jones, J., concurring). Therefore, Judge Calabresi opined that
[i]f Congress ... though it was made aware of both the dramatically disparate impact among minority groups of enhanced crack penalties and of the limited evidence supporting such enhanced penalties, were nevertheless to act affirmatively and negate the Commission’s proposed amendments to the Sentencing Guidelines (or perhaps were even just to allow the 100-to-l ratio to persist in *682 mandatory minimum sentences), subsequent equal protection challenges based on claims of discriminatory purpose might well lie.... As the Supreme Court has pointed out, facially-neutral legislation violates equal protection if there is evidence that the legislature has “selected or reaffirmed a particular course of action at least in part ‘because of,’ not merely ‘in spite of,’ its adverse effects upon an identifiable group.”
Then, 56 F.3d at 468 (Calabresi, J., concurring) (quoting Pers. Adm’r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)).
To interpret this statute in a manner that does not extend this equalizing mechanism to the thousands of individuals sentenced under the old mandatory minimums would create a “clear pattern, unexplainable on grounds other than race.... ” Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555. In fact, such a reading of the FSA creates the exact equal protection concerns raised by Judges Calabresi and Jones in their respective concurring opinions. Then, 56 F.3d at 467 (Calabresi, J., concurring); Smith, 73 F.3d at 1422 (J. Jones, concurring). Adopting new mandatory minimums for the purpose of righting the racially discriminatory wrongs of the past and not extending the benefits of the new enactment to the thousands of predominately African American individuals serving disproportionate sentences under a now-rejected statute violates equal protection because Congress has recognized and reaffirmed “its adverse effects” upon the African American community. Feeney, 442 U.S. at 279, 99 S.Ct. 2282.
The constitutional avoidance principle demands that we interpret a statute in a way that avoids any violation of the Constitution. “It is elementary when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity.” U.S. ex rel. Attorney Gen. v. Del. & Hudson Co., 213 U.S. 366, 407, 29 S.Ct. 527, 53 L.Ed. 836 (1909) (citing Knights Templars’ & M. Life Indem. Co. v. Jarman, 187 U.S. 197, 205, 23 S.Ct. 108, 47 L.Ed. 139 (1902)). Therefore, we must interpret the FSA’s new mandatory minimums to apply retroactively; otherwise, thousands of incarcerated individuals, most of whom are impoverished African Americans, will remain incarcerated under unequal, unjust, and unconstitutional prison sentences. Had Congress intended the new mandatory minimums to be only prospective, then Congress would have reaffirmed the inequalities that have now been acknowledged as lacking in any evidentiary basis and creating deep racial disparities. The majority’s reading of the FSA would assign to Congress an improper discriminatory purpose, which must be avoided under the Constitutional avoidance doctrine.[5] *683 Then, 56 F.3d at 468 (Calabresi, J., concurring); Brief for NAACP Legal Defense and Educational Fund as Amicus Curiae at 14. Such a reading would ensure the continued disproportionate incarceration of young African American crack cocaine offenders and would “send a message to the public that ‘the lives of white criminals are considered by the U.S. justice system to be at least 100 times more valuable and worthy of preservation than those of black criminals [sentenced prior to the FSA’s enactment].’ ” Smith, 73 F.3d at 1422 (Jones, J., concurring) (quoting Keith Owens, Crack in the System: Bias in Drug Laws Sends More Blacks to Jail, The Dallas Morning News, October 25, 1995, at A27).
B. Rational Basis Review
On the other hand, even absent Congressional discriminatory intent, the FSA’s mandatory mínimums must still be interpreted to apply retroactively under rational basis review. Where the government’s action “neither burdens a fundamental right nor targets a suspect class, [this Court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end.” Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Under rational basis review, any “classification ‘must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.’ ” Johnson v. Robison, 415 U.S. 361, 374-75, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) (quoting Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)). “The concept of equal justice under law requires the State to govern impartially. The sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective.” Lehr v. Robertson, 463 U.S. 248, 265, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (internal citation omitted).
Under the rational basis test, a petitioner generally carries a heavy burden to show that a statute is arbitrary and unsupported by any rational basis. Lindsley v. Nat’l Carbonic Gas Co., 220 U.S. 61, 78-79, 31 S.Ct. 337, 55 L.Ed. 369 (1911); New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). “[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.” City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). This principle, however, has broken down when “[a] protesting group was historically disadvantaged or unpopular, and the statutory justification seemed thin, unsupported or impermissible.” Massachusetts v. U.S. Dept. of Health & Human Servs., 682 F.3d 1, 10 (1st Cir. 2012). While courts are generally deferential to government enactments that neither burden fundamental rights nor make suspect classifications, they are more rigorous in their review under certain circumstances. Am. Express Travel Related Servs. Co. v. Kentucky, 641 F.3d 685, 691-92 (6th Cir.2011). The Supreme Court has applied this more rigid version of rational basis review to strike down group classifications that are not traditionally entitled to heightened scrutiny. See, e.g., Cleburne, 473 U.S. at 447-50, 105 S.Ct. 3249 (applying a more rigorous rational basis review to a zoning law impacting the mentally retarded); Romer, 517 U.S. at 631-35, 116 S.Ct. 1620 (applying a heightened rational basis standard to a classification subjecting *684 gays and lesbians to different treatment). See also Am. Express, 641 F.3d at 691-92 (citing Burstyn v. City of Miami Beach, 663 F.Supp. 528, 536-37 (S.D.Fla.1987), in which the district court applied a more stringent rational basis review to discrimination against the elderly). In each of these cases, the courts “stressed the historic patterns of disadvantage suffered by the group adversely affected by the statute ... [entitling them to] a more careful assessment of the justifications than the light scrutiny offered by conventional rational basis review.” Mass. v. H.H.S., 682 F.3d at 11.
Congress has made a distinction between crack cocaine offenders and powder cocaine offenders, the former being overwhelmingly impoverished African Americans. There may be no more abject, disparaged, powerless minority group than those sentenced under the old crack cocaine mandatory minimums. This is where the democratic process breaks down and traditional rational basis review is insufficient to protect the group of individuals convicted under federal crack cocaine mandatory minimums, more than 82% of whom were African American in 2005. USSC, 2005 Sourcebook of Federal Sentencing Statistics, Table 34 (2006). Courts should not be as deferential to government enactments under circumstances where an irrational classification based on the form of cocaine, which has real-world consequences in terms of sentencing disparities, tracks so closely with race.
The State cannot proffer any legitimate penological or pharmacological reason for the continued incarceration of those who were subjected to extended sentences under the unjust 100-to-1 ratio. Instead, in the face of this more rigorous rational basis standard, the government can only offer finality as its legitimate interest in support of the continued application of the old mandatory minimums. Although finality has previously been recognized as a legitimate state interest, Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), no one has cited a single case that says finality can support criminal convictions and overly onerous sentences based upon a premise that Congress has overwhelmingly and demonstrably acknowledged to be false as of the day it was passed. This crack versus powder cocaine sentencing scheme has institutionalized young black men at a rate entirely disproportionate to the facts on the ground. Although there may be a societal interest in the finality of criminal sentences under normal circumstances, “ ‘[t]here is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose.’ ” Penry, 492 U.S. at 330, 109 S.Ct. 2934 (quoting Mackey v. United States, 401 U.S. 667, 693, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)). Here, where Congress is silent on the retroactive application of mandatory minimums, finality cannot serve as a legitimate interest in the face of such abhorrent inequality.
Because thousands of individuals like the Blewetts remain incarcerated under a discriminatory sentencing regime that is unsupported by penological or pharmacological evidence and does not pass constitutional muster, the new mandatory minimums established by the FSA should be deemed to be retroactive. Failure to do so would defeat Congress’ clearly expressed intent to ameliorate the equal protection violation of the 1986 Drug Act.
In other words, a judicial determination that the FSA should apply retroactively would comport with Congress’ legislative objectives, as substantiated by the stat *685 ute’s legislative history, and would permit the statute to be construed in a manner that satisfies rather than violates the requirements of the Constitution’s Equal Protection Clause.

. As the Honorable Reggie B. Walton, United States District Judge for the District of Columbia, described in his statement before the Senate Committee on the Judiciary, he originally "advocated in support of disparity between crack and powder because [he], too, thought, based upon the information available [ ] at the time, that disparity at least on some level was appropriate.” However, he no longer supports the disparity and instead, recognizes that there is no evidentiary support for its further application. Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing Before the S. Sub-comm. on Crime and Drugs of the S. Comm, on the Judiciary, 111th Cong. 7 (2009) (statement of the Honorable Reggie B. Walton, United States District Judge for the District of Columbia).

. Dr. Nora Volkow, Director of the National Institute on Drug Abuse, also testified before the Sentencing Commission that "all forms of cocaine, regardless of the route of administration, result in a similar blockage of dopamine transporters ... which is why repeated use of any form of cocaine can lead to addiction and other health consequences.” Despite acknowledging that route of administration can cause different effects in the body, "she emphasized that the excess risk [of addiction] is not attributable to crack cocaine smoking or injecting [powder] cocaine.” Cocaine and Federal Sentencing Policy, at B-10-B-11 (May 2007). Similarly, Dr. Harolyn Belcher, Associate Professor of Pediatrics at Johns Hopkins University School of Medicine, stated in a report to Congress that although "the rate of drug distribution varies depending on the method of administration, [] the fetal effects of crack cocaine and powder cocaine, once they pass through the placenta, should be identical.” Id. at B-12.

. Dr. Blumstein also “pointed out that one of the attractive features of the federal sentencing guidelines is the ability to increase basic [ ] sentences for aggravating features ... such as carrying a gun or using a gun. This opportunity, according to Dr. Blumstein, obviates the need to differentiate between powder cocaine and crack cocaine in the drug guideline ...." Cocaine and Federal Sentencing Policy, at B-14 (May 2007).

. Judge Sutton’s opinion cites these two cases as well as an overly cumulative list of other cases for the proposition that this constitutional question has already been answered. However, all of these cases were decided before Congress acted to ameliorate the equal protection problems inherent in the 1986 Drug Act. Judge Sutton fails to present a single case decided since the FSA’s enactment that precludes such an equal protection argument.

. According to Judge Sutton's opinion, to demonstrate an equal protection violation based on a disparate impact theory, we must find that the same Congress responsible for addressing the racial inequality in cocaine sentencing was also "racist” with respect to the FSA's retroactivity. To the contrary, Congress’ lack of clear expression on the issue can be interpreted in at least two different ways: either Congress chose to apply the new mandatory minimums retroactively, finally rectifying a racial disparity that is unsupported by any penological or pharmacological justification, or Congress deliberately chose to deny relief to those individuals currently incarcerated under what is now recognized as an unjust, unequal, and unconstitutional sentencing scheme. The constitutional avoidance principle requires us to adopt the former interpretation and interpret Congress’ lack of explicitness in harmony with its intent to di *683 minish the racial disparity in crack and powder cocaine sentencing.